**APACHE COUNTY, Navajo County, Coconino County, and the State of Arizona, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 292-66.**

United States District Court
District of Columbia.
July 26, 1966.

------◆------

Wallace L. Duncan, Jennings, Strouss, Salmon & Trask, Washington, D. C., for plaintiffs.

John Doar, Asst. Atty. Gen., Stephen J. Pollak, Gerald W. Jones and Louis M. Kauder, Attys. Dept. of Justice, and David G. Bress, U. S. Atty., for defendant.

Norman M. Littell, and Jerry L. Haggard, Washington, D. C., for applicants for intervention Navajo Tribe of Indians and individual members of Tribe.

### OPINION

Before EDGERTON, Senior Circuit Judge, LEVENTHAL, Circuit Judge, and HOLTZOFF, District Judge.

LEVENTHAL, Circuit Judge:

This is an action, the first of its kind, brought under Section 4(a) of the Voting Rights Act of 1965 [1] by plaintiff counties and the State of Arizona for a declaratory judgment that would permit reinstatement of the operation of the literacy test which Arizona's legislature has prescribed as a requirement for voter registration.[2] Specifically, plaintiffs seek a judgment declaring that this literacy test has not been "used during the five years preceding the filing of this action for the purpose or with the effect of denying or abridging the right to vote on account of race or color."

The basic structure of Section 4 of the Act may be summarized briefly. The Act defines as a "test or device" "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrates the ability to read, write, understand, or interpret any matter." Section 4(c).[3] The provisions of section 4 apply in any state or political subdivision which the Attorney General determines maintained a "test or device" on November 1, 1964, if the Director of the Census determines that less than 50% of the residents of voting age were registered as of that date or voted in the presidential election of November, 1964. Section 4(b). These determinations are effective upon publication in the Federal Register.

Such publication operates in and of itself to suspend the effectiveness of the test or device. The underlying determinations of the Attorney General and the Director of Census "shall not be reviewable in any court." Once the determinations are made the test or device involved may not be enforced unless and until a declaratory judgment is issued by

---

1. 79 Stat. 438, 42 U.S.C. § 1973b(a).

2. Section 16–101 of the Arizona Revised Statutes provides:

    A. Every resident of the state is qualified to become an elector and may register to vote at all elections authorized by law if he:

    \*     \*     \*     \*     \*

    4. Is able to read the Constitution of the United States in the English language in a manner showing that he is neither prompted nor reciting from memory, unless prevented from so doing by physical disability.

    5. Is able to write his name, unless prevented from so doing by physical disability.

3. Section 4(c), 79 Stat. 438, 42 U.S.C. § 1973b(c), provides:

    The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

906

this court that no such test or device has been used during the preceding five years for the purpose or with the effect of denying or abridging the right to vote on account of race or color. The constitutionality of the statutory pattern was upheld in South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

The operation of the Arizona literacy test has been suspended in Apache County since August 7, 1965, and in Navajo and Coconino Counties since November 19, 1965, by virtue of publications on those dates of the section 4(b) determinations of the Attorney General and Director of the Census.[4] The three counties and the State filed this action on February 4, 1966. After several extensions, the United States filed an answer consenting to the entry of the declaratory judgment. The Navajo Tribe and thirty-one members of the Navajo Tribal Council (hereafter referred to collectively as "Navajos"), filed a motion to intervene. The moving papers are filed by the Tribe as *parens patriae* of Navajos resident in plaintiff counties, and by the individuals in behalf of themselves and all others similarly situated. These applicants urge that the action be dismissed or that the Attorney General be ordered to make a "full, impartial and complete" investigation into the use of the literacy test in the three counties. The case is before us now on plaintiffs' motion for summary judgment, acquiesced in by the United States, and on the Navajos' motion to intervene.

I

■ At the outset, we reject the Navajos' contention that they are entitled to intervene as a matter of right under Rule 24(a), Fed.R.Civ.P. Rule 24(a) (1) provides for intervention as of right when a statute confers an unconditional right to intervene. The Voting Rights Act of 1965 makes no express provision for intervention. It rather contemplates that the Attorney General will protect the public interest in defending section

4(a) actions. What the Navajos rely on is Rule 24(a) (2), which confers a right to intervene "when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action."

The Voting Rights Act of 1965 created a new and drastic remedy of a public nature—automatic suspension of literacy tests in areas with less than 50% voter registration. To turn a phrase around, there is no remedy without a right. But the right enforced by this remedy is a public right, appertaining not to individual citizens, but to the United States itself—called upon by Congress, in implementing the Fifteenth Amendment, to vindicate the right of all citizens of the United States collectively to be free from discrimination in any part of the United States on account of race or color. This public right and remedy are supplementary to but analytically distinct from the individual rights of those discriminated against by or in the areas involved.

The analytical distinction between public right and private right is not to be obscured by the public interest in effective enforcement of the private right. In establishing and defining new rights and remedies in the area of civil rights, Congress has made plain its keen awareness of the significance of such refinements. Thus, in section 204 of the Civil Rights Act of 1964, Congress provided a private right and remedy, an action for injunction brought by persons aggrieved by the threat of discriminatory denial of public accommodations, and provided for appearance by the Attorney General not as initiating party but as intervenor in the private action. 42 U.S.C. § 2000a-3.

■ As to voting rights, the Fifteenth Amendment declares in terms that these rights of United States citizens shall not be denied or abridged by any State on account of race or color. This is self-executing, and itself invalidates state discrimination. South Carolina v. Katzenbach, supra, 383 U.S. at 325, 86

S.Ct. 803. Congress has specifically provided that a person who under color of state law deprives a United States citizen of any right secured by the Constitution and laws "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." R.S. § 1979, 42 U.S.C. § 1983.

The Civil Rights Act of 1957 provides that if there are reasonable grounds to believe that a person is about to engage in a practice that would deprive a United States citizen of his right to vote without discrimination on account of race or color, "the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief." 42 U.S.C. § 1971(c). The authority to initiate such actions was upheld in United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). Actions under the 1957 law now have certain features similar to the action before us, since amendments have provided for the United States and States to be opposing parties (1960) [5] and for three-judge courts to expedite determination (1964).[6]

Under section 4 of the 1965 Act the action is filed in the first instance by a State or political subdivision, but it is the practical equivalent of an action to dissolve an outstanding restraint against enforcement of a "test or device"—obtained at the instance of the United States—although the restraint is in the form of a statutory suspension rather than a judicial injunction.

■■■■ Applicants cannot intervene as of right in this litigation between the United States and a State on the ground of necessity to protect their private interests. No decree in this public litigation can have the effect of legally binding or concluding the Navajos in any action to enforce their individual or private rights, e. g. under 42 U.S.C. § 1983. Though practical consequences to the applicants may be taken into account in

considering permissive intervention, one may not intervene as a matter of right in the litigation of others unless he shows "the equivalent of being legally bound" by the decree in their case. Sam Fox Publishing Co. v. United States, 366 U.S. 683, 694, 81 S.Ct. 1309, 1315, 6 L.Ed. 2d 604 (1961).

■■■■ The Government would go a step further. It argues that the spirit of the 1965 Act excludes intervention by private parties under any circumstances. We cannot agree. It is true that section 4 of the Act is structured in terms of interaction between federal and state (or local) governments. It is true, too, that speedy determination of section 4(a) suits brought by state or local governments is desirable. The very existence of this remedy reflects an awareness by Congress that the broad statutory suspension of tests may have an over-broad reach which requires corrective procedures to avoid unintended incursion on legitimate state policy. The special three-judge court has a statutory obligation to give the case precedence, 28 U.S.C. § 2284; see United States v. Griffin, 303 U.S. 226, 232, 58 S.Ct. 601, 82 L.Ed. 764 (1938).

But section 4 does not make conclusive a determination by the Attorney General that a test or device should be reinstated. Section 4(a) clearly requires that there be a judicial determination of the ultimate facts of non-discrimination in the pertinent five-year period. In contrast, another provision of section 4 expressly makes conclusive—not reviewable in any court—the determination of the Attorney General that on November 1, 1964, the State maintained a "test or device." Another illuminating contrast is provided by section 5,[7] with respect to enactment of new voter qualifications and requirements in states or subdivisions where tests or devices have been suspended. Those states or subdivisions may seek a declaratory judgment from this court *or* seek the approval or acquiescence of the

---

5. 74 Stat. 92, 42 U.S.C. § 1971(c).

6. 78 Stat. 241, 42 U.S.C. § 1971(h).

7. 79 Stat. 439, 42 U.S.C. § 1973c.

Attorney General. Under section 5, the Attorney General may thus permit new voting requirements to go into effect without court approval. Under section 4, however, a court order is required.

■■ In a section 4 action this court, as the Government properly admitted on oral argument, is not concluded by the acquiescence of the Attorney General. We are being asked to enter a judgment declaring the existence of a state of facts. This is a judicial not a ministerial act. The court's independent function necessarily implies the power and authority to call upon the traditional resources of the judicial system. We see no basis for supposing that Congress meant to strip the court of its customary authority to permit intervention deemed helpful by the court. In our view the court has discretionary authority to permit intervention by applicants offering to provide evidence or argument concerning the facts the court must determine in arriving at its declaratory judgment.

The Government's argument with respect to the essential nature of the Act does, however, point to the proper bounds for exercise of the court's power to permit intervention. Congress assigned to the Attorney General the primary role in vindicating the public interest under the Act. We should be reluctant indeed to permit intervention in a section 4(a) action in the absence of a plausible claim that the Attorney General is not adequately performing his statutory function, and that intervention is needed to enable the court properly to perform its declaratory function or in some other way to protect the public interest.

■ However, if the Attorney General has been derelict or deficient, if the fact-finding process is warped or inadequate, the court has the authority and indeed may have the duty to allow intervention to cure or relieve the deficiencies. Such intervention is not to be permitted except upon a strong showing. The showing made by the Navajos in this case will be considered in part III of this opinion.

## II

We have before us a large number of exhibits submitted by the plaintiffs to the Justice Department in February 1966, and submitted to us in support of plaintiffs' motion for summary judgment. These include affidavits and letters of voting officials in the three plaintiff counties, stating that they have not applied the literacy test in a discriminatory matter. These submissions are not bald conclusory assertions, but include materials and comment purporting to account for the phenomenon of low voter registration among the Indians and detailing increased efforts to provide Indians with more, and more conveniently located, registration facilities, notably efforts to provide more deputy registrars on the reservation. That this kind of submission is enough to establish a "prima facie case" for relief under section 4(a) is indicated by the Supreme Court's statement in South Carolina v. Katzenbach, supra, 383 U.S. at 332, 86 S.Ct. at 820, that "an area need do no more than to submit affidavits from voting officials, asserting that they have not been guilty of racial discrimination through the use of tests and devices during the past five years, and then to refute whatever evidence to the contrary may be adduced by the Federal Government."

The papers before us, including affidavits of the First Assistant and the Second Assistant to the Assistant Attorney General for the Civil Rights Division, establish that the United States answered plaintiffs' complaint only after the Department of Justice had completed an investigation of the administration of voting requirements in the three counties in order to determine whether there was any indication that the literacy test had been used to deny the right to vote on account of race or color. A Department attorney spent sixteen days in April 1966 in the three counties; he interviewed 47 people, including various local officials, voting registrars, and members of the Navajo, Hopi and Havasupi

Tribes.[8] Their names and addresses and the dates of the interviews have been furnished the court. The Department also reviewed the materials submitted by the plaintiffs, and correspondence in its files with respect to voting practices in the three counties.

The Department's answer reports that its investigation turned up evidence of one incident of discriminatory use of the literacy test. The Government claims that in 1964 an Apache County official up for re-election, upon learning that a number of Indians intended to vote for his opponent, arranged for a challenge to voters at the polls based on their inability to read the Constitution in English. The challenge, administered to Indians and non-Indians alike (but obviously aimed at the Indians), resulted in the disqualification of at least one registered Indian. The Department officials further report that no other discriminatory incident was unearthed in the course of the investigation. We are also advised that in 1965, subsequent to this incident, the Arizona legislature amended its voting laws so that the ability to read the Constitution in English, though retained as a requirement for initial registration, was eliminated as a ground for challenge of registered voters at the polls.[9]

The Government's answer to plaintiffs' motion for summary judgment concedes that on the basis of the pleadings, affidavits and other papers filed, plaintiffs are entitled to a summary judgment declaring that during the five years preceding the filing of the action the voter qualification standards set forth in Arizona law have not been used for the purpose or with the effect of denying or abridging the right to vote on account of race.

This is not a case where there is no dispute whatever as to the facts. The plaintiffs' assertion that there has been no discriminatory use of the literacy test is disputed by the Government in regard to the incident related. However, summary judgment may issue so long as there is no dispute as to a *material* fact. And on the record before us we conclude that any dispute as to the 1964 incident, if the plaintiffs do indeed retain their original position, is not material. Section 4(d) of the Act provides:

(d) For purposes of this section no State or political subdivision shall be determined to have engaged in the use of tests or devices for the purpose or with the effect of denying or abridging the right to vote on account of race or color if (1) incidents of such use have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future.

Certainly the incidents of discriminatory use have been "few in number." With regard to the specific technique of discrimination used once in 1964—through challenge, which may be initiated by any voter and be leveled against other voters after they registered—the possibility of recurrence has been obviated by the corrective amendment enacted by the Arizona legislature in 1965.

In addition the record before us shows efforts to correct the conditions other than a "test or device" which may account for low Indian registration. The Government did not admit in toto the allegations in paragraph VIII of the Complaint, which averred: "The failure of these Navajo Indians to register and vote

8. The affidavit sets forth: "Efforts were made to include in the investigation interviews with all persons who could be expected to know of incidents of discriminatory use of tests or devices for voter registration if any had occurred, or who would know of any complaints or rumors to the effect that such discrimination had occurred." The persons interviewed included the director of the Arizona Civil Rights Commission; representatives of the Governor and the Attorney General; the county attorney and county recorder in each of the three plaintiff counties.

9. Ariz.Rev.Stat. § 16–921.

is rooted in a variety of causes, none of which is related in any way to any purpose or intent on the part of the officials * * * to deny or abridge the vote of the Navajo Indians to vote on account of their race or color." The Government's answer admitted this allegation as to Navajo and Coconino Counties, but denied it as to Apache County, setting forth: "Defendant affirmatively alleges that there have been inadequacies (not involving the administration of the requirement of Arizona law that a voter be able to read the Constitution of the United States in the English language and be able to write his name) in registration and voting facilities on the Navajo reservation in Apache County, as to which Apache County officials have either taken affirmative remedial action or have given to the defendant written assurance that such remedial action will be taken." As already noted the affidavits and materials presented to us by plaintiffs include assertions as to past activities and future plans directed toward increasing facilities and opportunity for voting registration.

Plaintiffs have also assured the court that those registered in the three counties since the dates the literacy test was suspended will not have to re-register after reinstatement of the test, nor will they be subject to challenge for inability to read the Constitution in English.

On the basis of the pleadings, affidavits, and other materials presented by the parties, we agree that there is no genuine issue as to any material fact, and that plaintiffs' claim to declaratory relief has been established unless that claim is precluded by material presented by applicants for intervention.

### III

■ The applicants for intervention allege that registration and voting facilities have been inadequate and that the literacy test has discouraged and prevented many Navajos from voting. We have already noted the parties' admissions of past and present inadequacies of facilities, and steps taken to remedy that situation. In focussing on past discriminations in voting and registration facilities, the Navajos misconceive the nature and purpose of Section 4 of the Voting Rights Act of 1965. They erroneously contend that discriminations in number and convenience of registration facilities have operated as a "test or device" within the meaning of the statute. Those are statutory words of art, carefully defined in section 4(c) [10] for certain laws and practices, notably literacy tests. Relief against other laws and practices must be obtained through remedies other than the special section 4 machinery.

The moving papers of the applicants for intervention contain allegations that the literacy test has been applied in a discriminatory way. But no evidence supporting this averment appears in the affidavits of Mr. House (see note 15, infra) and Mr. McCabe, filed by the Navajos. Mr. McCabe does say, without reference to specific incidents, that in his past efforts over the years to induce Navajos to register "a great obstacle has been the fear of and the discouraging effect presented by the literacy test," and that "the great majority even of those who had some knowledge of English feared the literacy test and the embarrassment of taking it and failing."

■ This reflects a misunderstanding which prompts us to reiterate the nature and purpose of the Act. The constitutionality of literacy tests as such is clear, see Lassiter v. Northampton County Board of Election, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). The Act does not invalidate them. Arizona's adoption of a literacy test in 1913 was apparently a bona fide exercise of its constitutional authority as a newly admitted State to prescribe voter qualifications. There is no contention before us that the 1913 law was enacted for the purpose of withholding the franchise from Indians, and there are circum-

10. See note 3 supra.

stances indicating the contrary.[11] The issue is whether the literacy tests in effect on November 1, 1964, though fair and reasonable on their face, have been misused. "Congress had learned that widespread and persistent discrimination in voting during recent years has typically entailed the misuse of tests and devices, and this was the evil for which the new remedies were specifically designed." South Carolina v. Katzenbach, supra, 383 U.S. at 331, 86 S.Ct. at 820.

The suspension of literacy tests upon the publication of the specified determinations of the Attorney General and the Director of the Census is a result of a statutory presumption reflecting "a strong probability that low registration and voting are a result of racial discrimination in the use of such tests."[12] Congress acted upon the evidence "[t]hat literacy tests and other devices have been widely used in violation of the 15th amendment."[13] Congress provided the exemption action under section 4(a) to deal with the possibility that there might be "areas covered under the formula of section 4 where there has been no racial discrimination violating the 15th amend-

ment," by affording a state an opportunity to obtain "an adjudication that such tests or devices have not been used by it to accomplish substantial discrimination in the preceding 5 years."[14] Tests and devices "are not deemed to have been used in a forbidden manner if the incidents of discrimination are few in number and have been promptly corrected" 383 U.S. at 318, 86 S.Ct. at 813.

It is apparent that Mr. McCabe's affidavit is consistent with a non-discriminatory application of a literacy test adopted as a bona fide qualification for voting, and that the failure of Navajos to vote resulted either from genuine illiteracy or from failure to take the test. It is not material evidence that the test has been used to accomplish discrimination. None of the individuals seeking to intervene alleges that he or anyone else has been the victim of discriminatory application of the test. An affidavit of one Lloyd L. House, a Navajo official active in registration efforts, recounts remarks he heard from registration officials expressing opposition to Navajo voting, but it does not set forth any incident of discrimination.[15]

---

11. The literacy test was embodied in the 1913 Arizona Code. Ariz.Rev.Stat., 1913 Civil Code, Title 12, par. 2878. With exceptions not here material it was not until 1924 that a person born in the United States to members of an Indian tribe was a citizen of the United States. See Elk v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 28 L. Ed. 643 (1884); Act of June 2, 1924, 43 Stat. 253.

We are not here concerned with and are not to be understood as commenting upon the question whether and to what extent there may be a test or device that is illegal, even though applied uniformly to all persons within its scope, because it is not a genuine and substantial voting qualification, but rather was instituted as part of a calculated plan to deprive a minority group of the vote franchise. Compare H.R.Rep. No. 439, 89th Cong., 1st Sess., at pp. 12–14 (1965), U.S.Code Congressional and Administrative News 1965, p. 2437, citing, inter alia, Judge Wisdom's opinion in United States v. State of Louisiana, 225 F.Supp. 353 (E.D.La., three-judge court, 1963).

12. H.R.Rep. No. 439, 89th Cong., 1st Sess. p. 13 (1965).

13. H.R.Rep. No. 439, supra, at p. 12. For the nature, purpose and use of these tests and devices, reference is made to the Committee Report, and South Carolina v. Katzenbach, supra, 383 U.S. at 310–313.

14. H.R.Rep. No. 439, supra, at p. 14.

15. The affidavit of the Department of Justice official refers to an interview with Lloyd House, Deputy Registrar and Voting Chairman of the Tribe, but does not relate what Mr. House said.

In his own affidavit Mr. House identifies himself as head of the social security department of the Navajo tribe. He recounts various statements he heard, some at meetings of voting officials, with respect to the undesirability of voting by Navajos living on a reservation. He states that he was interviewed by a representative of the Department of Justice and continues: "Mr. House then told

■ In one respect the affidavits and data filed by the Navajos rebut, or at least cast doubt upon, a suggestion advanced by plaintiffs. Plaintiffs, but not the United States, contend that the low registration of the Navajos is ascribable to lack of interest in state and local elections. The material submitted by the Navajos includes, e. g., data of high Navajo registration in New Mexico, where apparently there is no literacy test. That material may support a conclusion of greater Navajo interest in voting than past low registration in Arizona suggests, but it is not evidence of discriminatory use of the literacy test.[16]

said representative much of the information stated above, and stated that based upon affiant's experience, it was affiant's opinion that discrimination was being practiced in Apache County, and that the so-called 'literacy test' was being applied in a method designed to deny Navajos the right to vote."

Mr. House fails in his affidavit to detail any incident of discriminatory application of the test.

Mr. House wrote to Attorney General Katzenbach on August 27, 1965, asking for Federal registrars, explaining the failure to supply 20 letters from Navajos denied registration as follows: "Our people are not capable in many instances of writing letters and because voting rights have been so meaningless for the past two (2) or three (3) decades, the people are not aware of the importance of this freedom of the American people." The inability to file 20 letters is plainly consistent with plaintiffs' allegations, if indeed it does not affirmatively support them.

Mr. House further states that "in January or early February of 1966" he took a Navajo woman, who did not speak English, but otherwise met all of the Arizona registration requirements, to Mrs. Dorothy Hubbell, then registrar in Apache County, but Mrs. Hubbell would not register her. The incident, if substantiated, would establish the entitlement of the woman involved to registration without regard to literacy. However, affiant's failure to identify the woman leaves the incident dangling, even assuming accuracy in the affidavit. Possibly the incident reflects confusion on the part of the registrars as to the legal situation during the period of suspension of the test. The February 3, 1966 affidavit of Mrs. Heap, county recorder of Apache County, sets forth that she was instructed by the county attorney to register illiterates otherwise qualified under Arizona law, but not to register persons who could not speak English until the state attorney general had ruled on their eligibility.

The asserted incident is not itself an incident of discriminatory use of the liter-

acy test, nor does the affidavit even specify that it occurred prior to the filing of the action on February 4, 1966. In view of the lack of specificity the court does not consider it sufficient to warrant either intervention by the Navajos or denial of judgment to the plaintiffs.

16. To the data of Navajo voting in tribal elections in Arizona, plaintiffs' rejoinder is that the Navajos' interest is solely in tribal elections of officials (of the Tribe) that have most to do with the life of the Navajos on the reservation, but that this does not constitute an interest in state and county elections, which relate to officials without jurisdiction, for the most part, over life on the reservation.

As to the Navajos' emphasis on New Mexico experience, their own papers show that in 1961 the Navajo Tribal Council adopted an Election Code for New Mexico including provision for reimbursing the State for extra expense incurred in furnishing additional facilities on the Reservation for registration and voting in federal and state elections. Comparable action for Arizona, though authorized by the Tribal Council apparently as far back as 1960 was not implemented by adoption of an actual Navajo Election Code for Arizona until June 1966, after the filing of the petition for intervention in this case.

Assuming the Navajos are interested in voting, the promised efforts of plaintiffs, aided by the June 1966 action of the Navajo Tribal Council with respect to improving facilities on the Reservation, may well be significant in increasing registration.

We note, without comment, the affidavit of a member of the Apache Tribal Council recording his opinion that 80% of the adult Apaches residing in Navajo County were registered, and 80% of these voted. Conditions on the Navajo reservation may account for the fact that apparently there is proportionately more registration and voting by Apaches in Navajo County than by Navajos in Apache County.

Failure of the applicants for intervention to allege any hard facts showing discriminatory use of the test undercuts their contention that the Attorney General has not conducted a thorough and objective examination into the situation in the plaintiff counties. Such a contention, if adequately supported, might form a basis for this court to allow intervention. But the Navajos have made no such showing in this case. We cannot accept their view that the insufficiency of the investigation is established by the fact that none of 31 members of the Navajo Tribal Council residing in the three counties was interviewed by the Justice Department attorney. He did interview Raymond Nakai, Chairman of the Tribal Council. He interviewed five other Navajo Indians, four of whom, including both the present (House) and former voting chairman of the Tribal Council, were Deputy Registrars and could be expected to be familiar with the voting problems of the Navajos. Perhaps it would have been desirable for the Department attorney to speak with more Navajos, including some of those now seeking intervention. But we cannot supervise the details of such investigations. And we think it was also important that he interview, as he did, members of the other Indian tribes in the area, and the political leaders and voting officials of the three counties involved.

Moreover, throughout the entire period of the investigation, when the Tribe was well aware of the pendency of this action to lift the suspension of the literacy test, the applicants for intervention could and should have brought to the attention of the Department of Justice any instances of discrimination in use of the literacy test. No such effort was made.

We see no basis for suspicion that the Attorney General's investigation was not fair and thorough. The record as a whole supports the conclusion that it was fair and adequate, and fully supports his conclusion that the literacy test has not been discriminately applied. What the Navajos have offered does not undermine, but rather underlines, that conclusion.

The motion for intervention is denied and plaintiffs' motion for summary judgment is granted. Pursuant to the provisions of Section 4(a) of the Voting Rights Act of 1965, this court will retain jurisdiction for five years, the action to be reopened in the event of a motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color.

Counsel will prepare an order in accordance with the views expressed in this opinion.