Victoria POSADA, et al., Plaintiffs-Appellants,

v.

LAMB COUNTY, TEXAS, et al., Defendants-Appellees.

No. 82–1415.

United States Court of Appeals, Fifth Circuit.

Oct. 11, 1983.

---

Albert H. Kauffman, Dallas, Tex., for plaintiffs-appellants.

White, Self, Davenport & Bass, Bob Bass, Plainview, Tex., for defendants-appellees.

Before REAVLEY and JOHNSON, Circuit Judges, and WYZANSKI *, District Judge.

JOHNSON, Circuit Judge:

The plaintiffs, Mexican-American citizens of Lamb County, Texas, claim that they are entitled to attorneys' fees under the Voting Rights Act of 1965, 42 U.S.C. § 1973*l*(e), and the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988, for the role they played in defendant County's adoption and implementation of a legally sound voting district apportionment plan. They also seek a permanent injunction against future malapportionment of the County's county commissioner and justice of the peace precincts. The district court denied both requests. It held the injunction unnecessary, in view of the County's present compliance with federal apportionment requirements and the lack of an immediate threat to modify or abandon the plan presently in force. Neither would it award fees. The court decided that, far from being the catalyst of change, the plaintiff's lawsuit had no significant effect. It found, to the contrary, that the defendants were on the verge of adopting the legally sufficient plan and submitting it for preclearance when the plaintiffs filed their lawsuit. The plaintiffs appealed both aspects of the ruling. We find no warrant in the record to overturn the district court's decision. Its judgment is accordingly affirmed.

I.

Lamb County, Texas became subject to the election procedure preclearance provisions of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*, on November 1, 1972. From that date forward the County's apportionment plans stood in clear, conceded violation of both the Voting Rights Act and the Constitution's one-man/one-vote principle. A reapportionment plan in effect from January 1, 1973 until early 1982 was implemented without the requisite preclearance by the Attorney General, Section 5, Voting Rights Act of 1965, 42 U.S.C. § 1973c; that plan created population deviations among the districts in excess of 100%. In 1976 the 1973 plan, along with several post-1973 modifications, was submitted to the Justice Department. The Attorney General denied preclearance and warned the County that elections could not be held under the plan

* District Judge of the District of Massachusetts, sitting by designation.

until it was approved. Undeterred, the County continued to use the plan in its biennial elections.

Pressure to conform the County's voting procedures to the constitution and federal law began to mount in late 1978. A request for redistricting by a local Chamber of Commerce prompted the County Commissioner's Court to establish a citizen's committee on reapportionment. The matter languished in committee until the 1980 census got underway; the committee then decided to postpone action until up-to-date census data became available. In the spring of 1981 redistricting efforts began in earnest. The committee and a city employee, all laymen to the intricacies of voting district apportionment, devised and submitted a series of plans to the County Commissioners. The last of the plans was adopted and submitted for preclearance in September 1981.

Shortly after submission of the 1981 plan the plaintiffs, Victoria Posada, Melquiarez Sanchez, Jesusa Bosquez, and Ignacio Rendon, first appeared on the scene via a request for a copy of the 1981 plan made by their attorney to the County Judge. In late September the plaintiffs submitted an extensive objection to the 1981 plan to the Justice Department. The plaintiffs did not send a copy of their objection to the County, or notify it that they had filed an objection with the Attorney General. In November 1981 the Justice Department notified the County that the data it had submitted in support of the plan was seriously inadequate, and requested further information.

The County surmised from the Justice Department's letter that its 1981 plan was too flawed to withstand the government's scrutiny. Finally acknowledging its need for skilled help, the County retained an attorney and a college professor, both experienced in redistricting, to assist it in devising a proper plan. Soon thereafter, the County notified the Justice Department that it intended to redraw the lines. Additional census data was obtained; in December, a completely revised plan began to take shape. Late in the month, the experts advised the County Judge that they expected the changes to be drastic.

On January 6, 1982, the plaintiffs' attorney informed the county's attorney and the County Judge that the plaintiffs intended to file suit. The County apprised the plaintiffs that it was in the final stages of preparation of a completely new plan, that it intended to submit the plan for preclearance no later than February 15, and that it would use the plan in the upcoming primary elections. Notwithstanding, the plaintiffs filed their complaint on January 13. A hearing on the plaintiffs' request for injunctive relief was set for January 21.

The county commissioners tentatively approved the plan and set it for the requisite public hearings before the district court hearing convened.[1] At the district court hearing on January 21, the County represented that its new plan was virtually complete and would be submitted to the Justice Department no later than February 5. It advised the court that it had no intention of holding any future elections under the concededly unconstitutional 1973 plan, and stated that it intended to enter an order extending the spring primary election schedule as necessary to insure that the new plan could be precleared and properly implemented. Based on those representations, the district court denied the plaintiff the immediate injunctive relief they sought against the use of the 1973 or 1981 plans. Instead, it recessed proceedings until February 3 to allow the County time to follow through on its plans.

The County conducted the public hearings as scheduled the following week. The local citizenry strongly opposed the plan. Most of the criticism focused on the plan's proposal to divide the communities of Littlefield and Olton into minority and nonminority segments and join the minority sections into a single, noncontiguous minority

---

1. Although the precise date on which the plan was tentatively approved does not appear in the record, it is apparent that that occurred between the date the complaint was filed, January 13, and the date of the district court hearing, January 21.

precinct. The commissioners responded to their constituents' adverse reactions by reminding them that a lawsuit was pending, and noting that another census would bring a new opportunity to redraw the lines.

The plan was adopted by the County following the final public hearings on January 26, and promptly submitted for preclearance. The resumption of district court proceedings, scheduled for February 3, was cancelled on the parties' agreement that the plan and the submission satisfied the plaintiffs' complaints.[2] On February 16, at the County's request, the district court and the County entered simultaneous, identical orders extending the election deadlines for the spring primary. The plan was approved by the Justice Department on April 5, 1982. May elections were conducted under the new plan. Several weeks after the elections the plaintiffs sought and were denied a permanent injunction and attorneys fees.

## II.

 Permanent injunctions are never lightly given. They are hedged about with circumspection: to win one, a petitioner must show a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner. *United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953); *Baldwin Metals Co., Inc. v. Donovan,* 642 F.2d 768, 775 and n. 17 (5th Cir.1981). The cautionary rhetoric of black-letter law binds with ferocity when the federal courts are asked to intervene in the legislative processes of a state, or its political subdivisions. More is called up than our usual reluctance to divert the course of private behavior; such a request, if granted, supplants the non-representative branch for the consensus of representatives, and interjects deeply, directly and finally the strictures of the federal government into the domain of the state. But cognizance of comity does not command abstinence. Encroachments on the exercise of the civil

liberties secured by the Constitution are barred no less when threatened by majoritarian domination of the political organs of the state.

 Our deepest concerns are awakened by legislative repression of minorities' political participation. Trammelling of elective rights by the state's representative bodies distorts the processes of consensus by muffling—or muting altogether—the voices of the less favored. It is a body blow to the body politic. Where it appears, it warrants close scrutiny; when it exists, it requires a firm judicial response.

The County's record under the Voting Rights Act is a deplorable history of flagrant, persistent violations of minority voting rights and defiance of federal election law. The plaintiffs urge that the County's pattern of malapportionment, coupled with its officials' responses to their constituents' opposition to the new plan, foreshadows a return to discriminatory practices, and request an order demanding continuing compliance. But we are less sure than the plaintiffs that judicial action is now necessary. Extrajudicial constraints—always preferable to our intervention—have pressed the County into present compliance. Aside from those few remarks the district court found were meant to allay a disgruntled citizenry, we have found no intimations that the County contemplates rescinding its plan in favor of one resembling the old. We agree with that court that, absent more concrete evidence that the County is about to return to its old ways, federal judicial intervention is presently unwarranted. *Lubbock Civil Liberties Union v. Lubbock Independent School District,* 669 F.2d 1038, 1049 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983); *Meltzer v. Board of Public Instruction of Orange County, Florida,* 548 F.2d 559 (5th Cir.1977), *affirmed on rehearing,* 577 F.2d 311, 1978, *cert. denied,* 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979).[3]

---

2. The district court's order cancelling the February 3 hearing is not in the record. We were told at oral argument that it was conveyed by telephone to the parties' counsel.

3. In *Lubbock Civil Liberties Union* and in *Meltzer,* this Court refused to overturn district court refusals to grant permanent injunctions against the reinstitution of discontinued uncon-

Our refusal to act should not be understood to condone the County's practices. Equal access to the franchise is the pulse of democratic government. Should evidence of the County's suppression of minority voting rights emerge, the federal courts will not hesitate to take the steps necessary to secure the right of full and fair participation in just elections.

### III.

■ The plaintiffs stake their claim to attorney fees on two assertions of victory. First, they claim that their opposition to preclearance of the 1981 plan contributed substantially to the Justice Department's decision to request more information, and so indirectly spurred the County to abandon that plan in favor of fresh efforts. Second, they claim that their lawsuit forced the County to make good on its declared intentions to have a constitutionally adequate plan precleared and in place in time for the spring primarys. The district court disagreed. On its evaluation of events, the plaintiff simply caught the train as it pulled out of the station. It found that from November 1981 on "all defendants were diligently working to have a plan submitted and in effect in time to be used in the 1982 elections," and that "[t]he plan was virtually complete when, on January 1[3], 1982 the instant suit was filed by the plaintiffs," Mem.Op. at 2. It concluded that a constitu-

tional plan "would have been accomplished in time for the 1982 elections regardless of the plaintiffs' complaint in this case," *id.* at 5.

Attorneys fees are available under § 1973 *l*(e) of the Voting Rights Act[4] and § 1988[5] to "prevailing parties" in voting rights litigation. The phrase carries the same general meaning under both acts, S.Rep. No. 295, 94th Cong., 1st Sess. 40 (1974), *reprinted in* [1975] U.S.Code Cong. & Admin.News 774, 807; *Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983); *Commissioners of Medina County, Texas v. United States,* 683 F.2d 435, 440 n. 6 (D.C.Cir.1982); *Bly v. McLeod,* 605 F.2d 134, 138–39 (4th Cir.1979); *Caserta v. Kelly,* 507 F.Supp. 561, 563 (S.D.Tex.1981) (three-judge court.). A "prevailing party" is one whose "ends are accomplished as the result of the litigation even without formal judicial recognition,"[6] *Williams v. Leatherbury,* 672 F.2d 549, 550 (5th Cir.1982); *Iranian Students Association v. Edwards,* 604 F.2d 352, 353 (5th Cir.1979); *Criterion Club of Albany v. Board of Commissioners,* 594 F.2d 118, 120 (5th Cir.1979); *see Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980), and who "can show both a causal connection between the filing of the suit and a defendants' action and that the defendants' conduct was required by law," *Williams* 672 F.2d at 551; *Nadeau,* 581 F.2d at 281; *see Long v. Bonnes,* 455

stitutional practices. In both cases, the offending school districts had vigorously defended the legality of their challenged practices, and had only reluctantly complied with constitutional standards, *Lubbock Civil Liberties Union,* 669 F.2d at 1039–41, 1049; *Meltzer,* 548 F.2d at 562–65, 568. In the situation presently before us, the defendant conceded its history of violations and adhered to its plan of compliance. We have, if anything, less reason to conclude that the district court abused its discretion, *W.T. Grant & Co.,* 73 S.Ct. at 897, in deciding that an injunction is not presently necessary.

4. Section 1973*l*(e) provides:

In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the Unit-

ed States, a reasonable attorney's fee as part of the costs.

5. Section 1988, provides in pertinent part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

6. Complete and unconditional success is unnecessary. Plaintiffs may be considered to have prevailed if "they succeed on any significant issue in litigation which achieves some of the benefit the party sought in bringing suit." *Hensley,* 103 S.Ct. at 1939, *citing with approval Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978).

U.S. 961, 102 S.Ct. 1476, 71 L.Ed.2d 681 (1982) (Rehnquist, J., dissenting from denial of certiorari); *Johnston v. Jago,* 691 F.2d 283, 286 (6th Cir.1982). Two of the three elements are not in dispute. The plaintiffs' ends were plainly accomplished: they sought to put a stop to the County's long-standing violation of the one-man/one-vote principle, to end the County's dilution of minority voting strength, and to achieve compliance with the Voting Rights Acts preclearance provisions. The plan used in the 1982 primary satisfied them, and passed the Attorney General's preclearance review. Neither is there a dispute over whether the County's conduct was required by law. The defendant concedes that its development, submission to preclearance and implementation of a non-discriminatory plan was demanded by the Constitution and federal statutes. Disagreement focuses solely on the requisite causal connection.

Causal connection is established by evidence that the plaintiffs' lawsuit was a "substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior," *Williams,* 672 F.2d at 551; *Coen v. Harrison County School Board,* 638 F.2d 24, 26 (5th Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 647 (1982); *Robinson v. Kimbrough,* 620 F.2d 468, 476 (5th Cir.1980). The plaintiffs do not have to prove that their efforts were the sole reason for the defendant's rectifying actions. Some award is due so long as the plaintiffs' actions made an important contribution to the improvements achieved. *Hensley,* 103 S.Ct. at 1939, 1942 n. 14; *Disabled in Action v. Mayor & City Council of Baltimore,* 685 F.2d 881, 885–86 (4th Cir.1982); *United Handicapped Feder-*

*ation v. Andre,* 622 F.2d 342, 348 (8th Cir. 1980). But participation without contribution is not enough. A fee award is not justified if the plaintiffs' suit was "completely superfluous," *Nadeau,* 581 F.2d at 281, to the attainment of relief. *Williams,* 672 F.2d at 551; *Criterion Club of Albany,* 594 F.2d at 120; *compare Ramos v. Koebig,* 638 F.2d 838, 845 (5th Cir.1981). "A civil rights plaintiff may not collect attorney's fees for demanding that a state officer do what he would have done in any case," *Coen,* 638 F.2d at 26.

■ At bottom, the inquiry is an intensely factual, pragmatic one. *Williams,* 672 F.2d at 551; *Coen,* 638 F.2d at 26–27 n. 1; *Criterion Club of Albany,* 594 F.2d at 120. Clues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events: defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways. *Ramos,* 638 F.2d at 845; *Robinson,* 620 F.2d at 476; *Nadeau,* 581 F.2d at 281. But credibility choices in the resolution of conflicting testimony are the district court's province as fact finder. Those conclusions can be set aside only if the evidence leaves us with the definite and firm conviction that the district court has made a mistake. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 1788, 72 L.Ed.2d 66 (1982) *citing United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).[7]

The pivotal issue is, then, whether the district court clearly erred in holding that the plaintiffs' lawsuit was not a significant catalyst in the defendant's adoption of the

---

**7.** The plaintiffs argue that whether a party has prevailed is not a question of fact reviewable under the clearly erroneous standard of Fed.R. Civ.P. 52(a), but is a mixed question of law and fact independently reviewable on appeal, *see Pullman-Standard,* 102 S.Ct. at 1788 n. 16. Their argument is misplaced. The legal aspects of the "prevailing party" determination, *i.e.,* whether the defendant's conduct was required by law and whether the relief attained alleviated the illegalities challenged, are not in dispute, *see ante* at 1071–1072. The sole issue is whether their legal actions were the cause in

fact of the steps the County took to bring itself into compliance with the Constitution and federal law. That question, as we see it, is a pure question of fact. *Long,* 102 S.Ct. at 1477–78; *Williams,* 672 F.2d at 551; *accord Nadeau,* 581 F.2d at 280; *Johnston,* 691 F.2d at 286; *Harrington v. DeVito,* 656 F.2d 264, 267 (7th Cir. 1981); *Charles v. Coleman,* 689 F.2d 774, 776 (8th Cir.1982); *American Constitutional Party v. Munro,* 650 F.2d 184, 187 (9th Cir.1981); *Gurule v. Wilson,* 635 F.2d 782, 792 (10th Cir. 1980).

1982 plan. But the plaintiffs' initial argument in support of their claim that they prevailed presents the usual problems of factual resolution in an unusual context. The plaintiffs maintain that they are entitled to attorneys fees for the results they claimed to have achieved through prelitigation participation in the Attorney General's preclearance review [8] of the 1981 plan. In support of their claim, they contend that the preclearance review is a "proceeding" within the meaning of the fee awards statutes' authorization of fees for success obtained "in any action or proceeding to enforce" the Constitution's voting guarantees, *see ante* nn. 2 & 3; *cf. New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (holding that the phrase "any action or proceeding" as used in section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k) (1976), authorizes awards of attorney's fees for work done by the prevailing complainant in state administrative and judicial proceedings to which the complainant was referred pursuant to the provisions of Title VII).

It is by no means clear to us that Congress intended the word "proceeding"

as used in section 1973*l* (e) to encompass the preclearance process. Textual interpretation of the Voting Rights Act lends no support to the argument: "proceeding" is used throughout the statute interchangeably with "action" to refer to judicial proceedings, *see, e.g.,* § 1973c (referring to actions for declaratory judgments as "proceedings"); § 1973j(f) (referring to certain actions by the Attorney General for preventive relief and to criminal actions under the Act as "proceedings"); § 1973*l* (referring to actions for declaratory judgments as "proceedings"). The Act does not use the word in creating or defining the Attorney General's obligation to conduct preclearance reviews, 42 U.S.C. § 1973c; [9] *compare New York Gaslight,* 100 S.Ct. at 2029–30. Neither does the statutory design of the Act's enforcement mechanisms support a conclusion that the Congress intended preclearance proceedings to be an integrated part of *private* enforcement mechanisms, *compare New York Gaslight,* 100 S.Ct. at 2031–32. Indeed, precisely the opposite appears. By statutory design, preclearance proceedings are independent of private remedies for the enforcement of the Voting Rights Act. "Once a plan has been submitted to

**8.** "Preclearance approval entails a finding, either affirmatively or because the Attorney General interposes no objection, that the standard, practice or procedure 'does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [because of a membership in a language minority].' [42 U.S.C. § 1973c]. Failure to obtain preclearance approval prior to implementation of any such standard, practice or procedure is a violation of the Act." *Commissioner's Court of Medina County, Texas,* 683 F.2d at 437.

**9.** § 1973c provides, in pertinent part:

[A] State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such [voting] qualification, prerequisite, standard, practice, or procedure [different from that in force or effect on the applicable effective date] does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court en-

ters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* that such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.... In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section.

the Attorney General, although interested parties may voice their opposition to or support of the plan, the final decision is the Attorney General's alone," *Commissioner's Court of Medina County, Texas,* 683 F.2d at 440. The Attorney General's decision to grant or deny preclearance is not subject to judicial review, *City of Dallas v. United States,* 482 F.Supp. 183, 185 (D.D.C.1979) (three-judge court). But by the same token, plans precleared remain vulnerable to attack in the courts on the same grounds subject to the Attorney General's review, 42 U.S.C. § 1973c.[10] The Attorney General's approval has no preclusive effect on interested parties, *City of Dallas,* 482 F.Supp. at 185. But most important is that, through creation of the preclearance review, the Congress entrusted the Attorney General with an affirmative obligation to secure enforcement of the provisions of the Voting Rights Act. By law, the Attorney General bears the responsibility for vindicating the public interest under the Act by achieving full and uniform compliance with its provisions throughout the jurisdictions of its application, *see Apache County v. United States,* 256 F.Supp. 903, 908 (D.D.C.1966) (three-judge court); *see also NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 2604, 37 L.Ed.2d 648 (1973). The provisions for

attorney's fee awards under section 1973*l*(e) and section 1988 were intended to enable private citizens to serve as "private attorneys general" in bringing suits to vindicate the civil rights laws, *see* 122 Cong.Rec. 35127 (1 Oct. 1976) (remarks of Rep. Holtzman in the House debates on the Civil Rights Attorneys Fees Awards Act of 1976).[11] That interest is far less compelling when the private action occurs in the very context of the Attorney General's action on behalf of those whose rights are affected.

■ In view of the latter consideration, we find it unnecessary to decide in this case whether attorney's fees can ever be awarded for participation in a preclearance review, either prior to or in the course of litigation.[12] Assuming for the sake of argument that fees are available in such circumstances, we believe that their award is governed by standards analogous to those applicable to fee applications for work done as a private intervenor on the side of the government in its judicial actions to enforce the civil rights laws. Confronted with a request for fees by intervenors on the side of the United States in a section 5 declaratory judgment action under the Voting Rights Act,[13] the District of Columbia Cir-

10. "Neither an affirmative indication by the Attorney General that no objection will be made nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin an enforcement of such [plan]," 42 U.S.C. § 1973c.

11. Representative Holtzman stated:
 Plaintiffs who suffer discrimination and other infringements of their civil rights are usually not wealthy people. The organizations who have helped them bring their cases are frequently not well financed. The Justice Department does not have the resources to bring suit for every civil rights violation. Thus, many people, deprived of their civil rights, may not as a practical matter be able to do anything about it. It is not right to deny people who cannot afford to pay attorneys' fees the availability of justice through our courts.

12. This case presents no question of the propriety of a fee award to parties whose opposition to a plan through participation in a preclearance review was known to the submitting jurisdiction and had a *direct* effect on the jurisdic-

tion's decision to abandon or modify the plan, *cf. Commissioner's Court of Medina County, Texas,* 683 F.2d at 443.

13. Such actions are similar to the preclearance review in two aspects. First, they are designed to enable a submitting jurisdiction to seek a determination against the government that its plan was not adopted in furtherance of a discriminatory purpose and would not, in effect, discriminate on the basis of race, color, or other improper criteria, 42 U.S.C. § 1973c; *Commissioner's Court of Medina County, Texas,* 683 F.2d at 437–38. Second, the judgment entered does not preclude a later, private action to enjoin enforcement of the plan, 42 U.S.C. § 1973c. But an intervenor's request for fees upon successful participation in such a proceeding is bolstered by a suggestion in the legislative history of § 1973*l*(e) of their availability in such circumstances. Sen.Rept. No. 295, 94th Cong. 1st Sess. 40 (1974), *reprinted in* [1975] U.S.Code Cong. & Admin.News 774, 807 ("In the large majority of cases the party or parties seeking to enforce [civil] rights will be the plaintiffs and/or plaintiff-intervenors.

cuit held that the Attorney General's participation in satisfaction of his affirmative, statutorily-imposed obligation to enforce the voting rights laws constituted a "special circumstance," *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) creating an exception to the usual presumption in favor of granting attorney's fees to a party whose objectives have been achieved. *Donnell v. United States,* 682 F.2d 240, 247 (D.C.Circuit 1982). Drawing on precedent denying fees to intervenors whose efforts made little or no independent contribution to the result achieved,[14] the Court held that fees may be awarded only if the governmental litigant did not adequately represent the intervenors' interest, if the intervenors proposed different theories and arguments for the court's consideration, and if the work the intervenor performed was of important value to the court, *Donnell,* at 248–49; *accord, Alabama Power Company v. Gorsuch,* 672 F.2d 1, 4 (D.C.Cir.1982); *Silberman v. Bogle,* 683 F.2d 62, 65 (3rd Cir.1982).

The similarities between section 5 declaratory judgment proceedings and preclearance reviews, *see ante* n. 11, convince us that *Donnell*'s approach applies equally here. We therefore hold that if fees can be obtained at all for private opposition mounted in a preclearance review, which review resulted in the Attorney General's expression of dissatisfaction with the plan, the award must be justified by a showing that the private objectors' participation, through particularly astute criticism or creative legal argument, changed the result that the Attorney General would otherwise have reached. We will not presume that the Attorney General has failed adequately to satisfy his statutory obligations to enforce the public interest in compliance with the voting rights legislation, or that the

reservations the Attorney General voiced would have passed unnoticed absent objections filed by private parties, *Donnell,* 682 F.2d at 248; *Silberman,* 683 F.2d at 65. Absent evidence that the objectors' work had a substantial independent effect on the outcome of the preclearance review, the threshold burden to justification for an award of fees for preclearance participation has not been met.

■ The plaintiffs' claim to victory does not pass muster. Observing that some of the deficiencies in the 1981 plan noted by the Attorney General in his November letter to the County were the same as problems they had pointed out in the objection they submitted in opposition to the County's application for preclearance, the plaintiffs claim partial responsibility for the Attorney General's expression of dissatisfaction, and partial credit for the County's consequent decision to abandon the 1981 plan. It is quite possible that their extensive comment assisted the Attorney General in organizing the pertinent materials, identifying the problem areas and crystalizing the issues. But there is no evidence that their submission carried the Attorney General beyond the analysis he would have otherwise have undertaken. Without such a showing, we cannot credit the plaintiffs with responsibility for the result of the Attorney General's review, or with consequent, indirect influence on the County's decision to abandon the 1981 plan. The Attorney General's response must be considered the result of his satisfaction of his affirmative statutory obligations. The County's decision must be attributed to its justifiable concern over the Justice Department's dissatisfaction.

We are left, then, with the plaintiffs' claim that had they not filed suit, the Coun-

---

However, in the procedural posture of some cases (*e.g.,* a declaratory judgment suit under § 5 of the Voting Rights Act), the parties seeking to enforce such rights may be the defendants and/or defendant-intervenors."); *see also* Sen.Rep. No. 1011, 94th Cong. 2nd Sess. 4 (1975), *reprinted in* [1976] U.S.Code Cong. & Admin.News 5908 (similar statement appearing in the legislative history of section 1988).

14. *Donnell,* 682 F.2d at 247–48, nn. 16 & 17, *citing Seattle School District No. 1 v. Washington,* 633 F.2d 1338 (9th Cir.1980) *aff'd,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) *and Bush v. Bays,* 463 F.Supp. 59, 66 (E.D.Va.1978).

ty would not have adopted the 1982 plan either at all, or at least in time for the spring elections.[15] The question is close. As the plaintiffs point out, the record of the public hearings discloses vigorous public opposition to the plan, the County officials' responses disclosed their personal dissatisfaction with it, and the County's history did not augur well for voluntary compliance. The district court recognized these factors, but found decisive the commitment to compliance exhibited by the County's dedicated efforts, partially completed before litigation began, to adopt a plan meeting constitutional and federal statutory standards, its avowed determination to achieve preclearance and implementation in time for the upcoming elections, and its unhesitating cooperation with all efforts to effect a sound plan.

The chronology of events is of little assistance. The plaintiffs filed suit just at the critical juncture of the experts' unofficial, though solicited, proposal of an adequate plan and the plan's official endorsement and implementation. Certainly, the County would have, and did, take seriously the possible sanction of judicial action if it failed to act. But the district court found that this sanction was imposed after the County had already responded to Justice Department pressure and resolved to comply with the law. In its view, the plaintiff's lawsuit may well have strengthened this resolve by making more immediate the consequences of dereliction of duty—but in doing so, the district court found, the plaintiff's action only sharpened the pressures to hew to a course of action already begun.

We have no crystal ball. We cannot say with certainty that the County would have defaulted yet again had the plaintiffs not intervened. That being so, we cannot

set the district court's decision aside as clearly erroneous.

The judgment of the district court is accordingly affirmed.

AFFIRMED.

WYZANSKI, District Judge, dissenting:

Judge Johnson's opinion comprehensively states the facts and analyzes the governing authorities. Repetition would be superfluous.

Moreover, I am not in disagreement with his conclusion that the appellant plaintiffs cannot prevail on the ground which his opinion first considers: to wit, the plaintiffs' "claim that their opposition to preclearance of the 1981 plan contributed substantially to the Justice Department's decision to request more information, and so indirectly spurred the County to abandon that plan in favor of fresh efforts."

But I reluctantly dissent from the court's holding that (on the basis of the command of Fed.R.Civ.P. 52(a), that "Findings of fact shall not be set aside unless clearly erroneous") we should defer to the district court's factual finding that on the credible evidence the plaintiffs have not proved their claim that had they not filed suit on January 13, 1982 the County would not have made good on its declared intentions to have a constitutionally adequate plan precleared and in place in time for the 1982 spring primary.

Judge Johnson's opinion states that "The question is close." Obviously, I cannot say that the question admits of only one plausible answer: my respect for the considered statements to the contrary made by both the district judge and my brethren on this panel precludes any such declaration. Yet, for the following reasons, I am strongly driven to the belief that the district court's

---

**15.** The plaintiffs claim that they won two judicial orders, the first directing the County, at time of the first hearing, to complete its preclearance submission by February 5 on pain of judicial intervention, the second extending the spring election schedule to accommodate the delayed implementation of the new plan. The record does not support these claims. The district court specifically abstained from entering

any order at the initial hearing. It merely recessed in order to allow the County time to hold the already scheduled public hearings prerequisite to adoption and submission of the plan. Neither can the plaintiffs be credited with obtaining the schedule extension order. That order was sought by the County, entered at its request, and paralleled one it simultaneously entered on its own authority.

finding on the facts with respect to the claim which Judge Johnson takes up second is within the meaning of Rule 52(a) a "clearly erroneous" finding.

1. From January 1, 1973 to March 22, 1976 the County operated under a plan which was admittedly plainly unconstitutional and which the County did not, as required by the Voting Act, 42 U.S.C. § 1973c, submit to the Attorney General for preclearance or make the subject of a section 5 declaratory judgment action.

2. When, at last on March 22, 1976, the County did submit a plan to the Attorney General it procrastinated in providing plainly requisite relevant information, despite repeated requests from the Department of Justice, in such communications as those of May 25, 1976, and September 3, 1976.

3. Ignoring the demands of the Department of Justice for required information, the County in November 1976 held an election under a plan that it has admitted was unconstitutional.

4. In November 1978 the County held another election under the admittedly unconstitutional plan.

5. In January 1979 the County established a committee to draw a new plan. In July 1981 the County Commissioners approved the plan. On September 9, 1981 the County submitted this new plan to the Department of Justice. On November 6, 1981 the Department requested the County to supply additional information as to the new 1981 plan. The County admits that it was not until then that it began to think seriously about, or to take steps with respect to, a constitutional plan. [*See* defendants' brief, at 7].

6. On January 13, 1982 the plaintiffs filed the suit upon which their claim for compensation is bottomed. Responding to the plaintiffs' complaint, the district court on January 13, 1982 set for January 21, 1982 a hearing on the plaintiffs' prayer for a temporary restraining order. Between January 13 and January 21 the County Commissioners tentatively approved a plan for submission to the district court. And it was only on January

25 and 26—four or five days after the district court hearing in the course of which the district judge had issued a solemn warning to the County—that the Commissioners held public hearings on that plan. In the course of those hearings there were many references to the plaintiffs' lawsuit.

The foregoing chronology reveals a dramatic change in the County's rate of speed of compliance with federal law at the very moment when the plaintiffs filed in January 1982 the civil action which they say entitles them to compensation. Those who cause public officials to stop ambling and to march, if not dance, to the nation's anthem of equality seem to me pipers entitled to be paid.

I am persuaded that the district judge's finding that the plaintiffs did *not* cause the plan to be adopted is "clearly erroneous."