ROYAL CROWN COLA CO.,
Plaintiff–Appellee,
Cross–Appellant,

v.

The COCA–COLA COMPANY, PepsiCo, Inc., and Dr. Pepper Co.,
Defendants–Appellants, Cross–Appellees.

No. 88–8014.

United States Court of Appeals,
Eleventh Circuit.

Nov. 13, 1989.

Rein & Fielding, Washington, D.C., for plaintiff-appellee, cross-appellant.

Gordon B. Spivack, Coudert Brothers, New York City, Frank C. Jones, King & Spalding, Atlanta, Ga., for COCA-COLA CO.

Before JOHNSON and CLARK, Circuit Judges, and ZLOCH[*], District Judge.

CLARK, Circuit Judge:

In this appeal, the appellants challenge the propriety of an award of almost 1.4 million dollars in attorney's fees in favor of the Royal Crown Company (Royal Crown) for its efforts to prevent PepsiCo Inc. (PepsiCo) and the Coca-Cola Company (Coca-Cola) from acquiring certain carbonated soft drink companies. 678 F.Supp. 875. Because we find that Royal Crown is not a "prevailing party" within the meaning of the Clayton Act, 15 U.S.C. § 26, we reverse.

## I. BACKGROUND

In the year 1986, two carbonated soft drink company giants each attempted mergers with other well known carbonated soft drink companies. These mergers were ultimately aborted. Today, we attempt to resolve the remaining repercussions of actions taken during that year.

On January 24, 1986, PepsiCo announced its plans to acquire the Seven-Up Company (Seven-Up) through Seven-Up's parent company, Philip Morris, Inc. Shortly thereafter, Coca-Cola announced on February 25, 1986, that it planned to acquire the Dr. Pepper Company (Dr. Pepper) through Dr. Pepper's sole stockholder, DP Holdings, Inc. The parties to these merger agreements filed their respective notification and report forms with the FTC and with the Department of Justice as required by the Hart-Scott-Rodino Antitrust Improve-

Richard T. Coleman, Howrey & Simon, Washington, D.C., Jerrold J. Ganzfried, Richard A. Marchetti, Page, Scrantom, Harris & Chapman, Columbus, Ga., for defendants-appellants, cross-appellees.

Trammell E. Vickery, Hansel & Post, Atlanta, Ga., Jonathan Band, Wm. F. Squadron, Washington, D.C., for D. Pepper.

Albert W. Stubbs, Hatcher, Stubbs, land, Hollis & Rothschild, Columbus, Ga., David Lee Foster, Willkie Farr & Gallagher, New York City, James H. Wallace, Jr., Wiley,

[*] Honorable William J. Zloch, U.S. District Judge, for the Southern District of Florida, sitting by designation.

ments Act of 1976, 15 U.S.C. § 18a (Hart–Scott–Rodino Act). At the same time, Royal Crown retained legal counsel in order to mount a challenge to these acquisitions.

The Hart–Scott–Rodino Act establishes a 30–day waiting period following the submission of certain forms during which time any applicable acquisition cannot be consummated. 15 U.S.C. § 18a(b)(1). In the present case, the FTC requested additional information from the parties thereby extending the waiting period for 20 days following the parties' response to the request. 15 U.S.C. § 18a(e)(2). In early June, it was apparent that the FTC's investigation of PepsiCo's acquisition of Seven–Up and Coca–Cola's acquisition of Dr. Pepper was not proceeding at optimal speed. Upon this realization and at the FTC's request, the involved parties agreed not to complete the proposed acquisitions prior to 11:59 p.m. on June 24, 1986. The FTC later scheduled a closed meeting for June 20, 1986 to consider both proposed acquisitions.

On June 19, 1986, Royal Crown filed a complaint together with a motion for a temporary restraining order, (TRO), in the Middle District of Georgia. In its motion for a TRO, Royal Crown asked the district court to enjoin the proposed acquisitions pending a hearing on the merits of Royal Crown's complaint. On June 20, 1986, the same day that the FTC was scheduled to vote on whether to challenge the acquisitions and four days before the extended waiting period was to expire, the district court for the Middle District of Georgia held a hearing on Royal Crown's application for a TRO. Following argument by all of the parties, the district court granted the TRO and, at the request of Seven–Up, the court scheduled a hearing for June 30, 1986 in order to determine whether to issue a preliminary injunction. The district court also ordered expedited discovery. Later that same afternoon, the FTC voted to challenge both the PepsiCo and the Coca–Cola transactions.

On June 23, 1986, the FTC filed a motion in the district court for the District of Columbia to enjoin Coca–Cola from consummating the acquisition of Dr. Pepper.

The FTC did not challenge the Seven–Up acquisition because, on that same day, PepsiCo and Philip Morris abandoned their efforts to complete their transaction. On June 24, the FTC and Coca–Cola appeared before the D.C. district court and, rather than present arguments for and against the implementation of a TRO, the parties represented to the court that Coca–Cola would not consummate the acquisition until the D.C. district court ruled on the FTC's application for a preliminary injunction.

The next day, June 25, 1986, the remaining parties to the Georgia litigation, Royal Crown, Coca–Cola and Dr. Pepper, met in the Georgia district court to discuss a problem with the scheduled date of the preliminary injunction hearing to take place in that court on the 30th of June. Coca–Cola and Dr. Pepper requested the district court to postpone the hearing in order to allow the FTC action to proceed to hearing in the District of Columbia in mid-July. Although the Georgia district court vacated the June 30th hearing and stayed discovery until July 28, 1986, it ordered, without a hearing on the merits, that the existing TRO be continued as a preliminary injunction against Coca–Cola and Dr. Pepper and that a trial on the merits be accelerated to August 25, 1986.

On July 16, 1986, the D.C. district court held a hearing on the FTC's application for a preliminary injunction and on July 31, 1986, the injunction was granted until such time as the FTC completed its administrative proceeding with respect to the Dr. Pepper acquisition. Coca–Cola challenged this decision by requesting an expedited appeal which the FTC opposed. The Coca–Cola/Dr. Pepper agreement of February 1986 provided that if, for any reason, the transaction did not close by August 29, 1986, either party could terminate the agreement. On August 5, 1986, five days after the D.C. district court issued a preliminary injunction in favor of the FTC, Coca–Cola and Dr. Pepper announced that they too had abandoned their proposed acquisition.

Royal Crown subsequently filed a motion requesting an award of attorney's fees.

At the request of some of the defendants, the district court heard oral argument on Royal Crown's motion, but did not hold an evidentiary hearing. On August 25, 1986, a stipulation and order was entered in the Georgia district court vacating the preliminary injunction and dismissing the complaint but reserving to any party the right to seek attorney's fees.

In a memorandum dated January 16, 1987, the district court found that Royal Crown was entitled to a fee award pursuant to section 16 of the Clayton Act. In determining that Royal Crown's action was a "substantial factor" and a "catalyst" in causing the abandonment of the proposed acquisition, the district court set out the following:

The Court has given consideration to the briefs submitted and oral arguments made by counsel and has concluded that in this case the situation which existed before Royal Crown filed suit, the situation as it now exists, and the intervening course of events clearly show that Royal Crown was both a "substantial factor" and a "catalyst" in motivating the Defendants to terminate their planned acquisitions. Royal Crown filed this action on June 19, 1986. Prior to that time both the Coca–Cola acquisition of Dr. Pepper and the Pepsico acquisition of Seven–Up were to be consummated at the end of the Hart–Scott–Rodino waiting period which is required for all large mergers. In conjunction with its complaint, Royal Crown, at the same time, filed a motion for a temporary restraining order and at that time no action had been taken by any government agency to challenge these transactions, and prospects for any such action were uncertain. The Court conducted a hearing on June 20 and issued the requested temporary restraining order that prevented immediate consummation of the proposed acquisitions after the waiting period, and at the same time, at the request of counsel for Philip Morris and Seven–Up, set a hearing on the application for preliminary injunction to begin just ten days later on June 30. Later the same day (June 20), after this Court had issued the temporary restraining order, the Federal Trade Commission (FTC) decided that it would institute its own proceeding to challenge the acquisitions.

After obtaining the temporary restraining order Royal Crown immediately launched full-scale discovery to prepare for the preliminary injunction hearing, dispatching teams of lawyers to a number of locations to review the Defendants' documents and simultaneously scheduled and commenced depositions of the Defendants' key officials and experts. After some of the depositions had already begun, Philip Morris, Seven–Up, and Pepsico announced on June 23 that their proposed transaction had been cancelled. In light of this development the temporary restraining order which had been entered by this Court on June 20, insofar as it applied to those Defendants, was vacated on June 26 and therefore did not continue in effect as a preliminary injunction against them. After the announcement on June 23 above mentioned the Royal Crown lawyers who had been assigned to review the documents of Pepsico, Philip Morris, and Seven–Up were redeployed to continue Royal Crown's discovery efforts against Coca–Cola and Dr. Pepper.

Because this Court had already issued a temporary restraining order it was not necessary for the FTC to seek immediate judicial relief. Rather, the FTC acceded to Coca–Cola's request that a preliminary injunction hearing be scheduled in the United States District Court for the District of Columbia in the middle of July. After having obtained a tentative hearing date of mid-July in that court, Coca–Cola then represented to this Court that there was an unavoidable scheduling conflict and asked this Court to postpone the preliminary injunction hearing in this case, which, as above noted, had already been set for June 30. In an effort to accommodate Coca–Cola's difficulties, this Court agreed to adjourn the June 30 preliminary injunction hearing under the following conditions: (1) this Court's original restraining order would "contin-

ue in effect as a preliminary injunction" until a plenary hearing on the merits; (2) a one week trial on the merits would be held in Columbus beginning August 25; and (3) expedited discovery would be suspended temporarily to resume again as of Monday, July 28. This Court made it clear that the revision of schedule of events in this court as above indicated was solely for the purpose of accommodating counsel for Coca–Cola and Dr. Pepper and that the proceedings in this action in this court would not otherwise be governed or affected by the proceedings in the District of Columbia court or by the determinations which might be ultimately made by that court.

The parallel FTC action in the District of Columbia proceeded to a preliminary injunction hearing on July 16–18. Full-scale discovery in the action pending in this court recommenced on July 28 looking toward the August 25 trial on the merits. That full-scale discovery continued even after the District of Columbia court on July 31 reached the stage that this Court had previously reached by issuing an order granting the FTC's motion for preliminary relief. Finally, following several more days of discovery activity by Royal Crown and in the course of Royal Crown's deposition of one of the Coca–Cola economic experts, Coca–Cola and Dr. Pepper announced on August 5 that the proposed acquisition had been abandoned.

Royal Crown does not contend, and this Court does not conclude, that the action then pending in this court was the sole cause for the Defendant's [sic] abandonment of the challenged acquisition. Undoubtedly the parallel FTC proceeding in the District of Columbia also played a role in the abandonment, but the Court regards the contention of the Defendants that the pendency of this private antitrust action in this court was of no concern to the Defendants and was not a motivating factor in their decision to abandon the merger [sic] to be unrealistic and incredible.[1] After all, it was Roy-

al Crown who obtained the first judicial relief and indeed the controlling relief throughout the legal challenge to the proposed transactions, and the mere existence of another suit later instituted which sought the same injunctive relief does not warrant denying or diminishing Royal Crown's right to an award of attorney's fees. In *Grumman Corp. v. LTV Corp., supra,* it was held that a subsequent FTC decision to challenge a merger did not defeat the right of the plaintiff in a private antitrust suit to an attorney's fee under Section 16 of the Clayton Act. The Coca–Cola–Dr. Pepper transaction could not be completed until this Court ruled on its merits regardless of any decision made by the District of Columbia court as a result of the July preliminary injunction.

In summary, the proposed acquisitions were moving forward toward imminent consummation before Royal Crown filed its action in this court and now they are terminated, and this is precisely the relief which Royal Crown sought. The Court determines as a matter of fact that the injunctive relief obtained by Royal Crown in this action as well as Royal Crown's vigorous prosecution and discovery efforts constituted a substantial factor and a catalyst in motivating the Defendants to terminate their acquisitions, and concludes as a matter of law that in this factual setting Section 16 of the Clayton Act thus entitles Royal Crown to an award of attorney's fees and expenses, and the Court will make such an award.

(D.Ct. Order, January 16, 1986 at 3–7) (footnote 2 omitted).

The district court ultimately entered judgments in favor of Royal Crown and against Coca–Cola and Dr. Pepper each in the amount of $394,862 and against Pepsi-Co in the amount of $284,825. No judgment was entered against Seven–Up and Philip Morris because they had entered into a settlement agreement with Royal Crown and were no longer parties to the proceed-

---

1. If Dionysus had suspended two swords over the head of Damocles is it likely that Damocles would have been concerned about one but not the other?

ings. Specifically, the district court awarded Royal Crown attorney's fees for (1) preparing for and prosecuting the district court action, (2) lobbying the FTC to adopt Royal Crown's position on the acquisitions, and (3) filing an *amicus curiae* brief on behalf of Royal Crown in the Supreme Court case of *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). The district court denied Royal Crown's request for the reimbursement of expert witness fees and certain other costs and reduced the total award by five percent for duplication of effort among the three firms representing Royal Crown. This appeal ensued.

## II. DISCUSSION

We subject the district court's factual finding that Royal Crown's litigation "catalyzed" the appellants' abandonment to the "clearly erroneous" standard of review. *Cf. Hewitt v. Helms*, 482 U.S. 755, 768, 107 S.Ct. 2672, 2680, 96 L.Ed.2d 654 (1987) (Marshall, J. dissenting) (question of whether litigation was "catalyst" in causing defendant's actions is an issue of fact). The amount of the attorney's fees award, however, is scrutinized for an abuse of discretion. *Fields v. City of Tarpon Springs*, 721 F.2d 318, 322 (11th Cir.1983). The appellants raise essentially four issues on appeal. First, they claim that the district court was clearly erroneous in finding that the Georgia litigation was a "substantial factor" and a "catalyst" resulting in the abandonment of the acquisitions in question. Second, the appellants argue that the district court erred as a matter of law in beginning its attorney's fee analysis without a loadstar figure. Third, citing specific points of error as to certain items, they argue that the district court abused its discretion in awarding Royal Crown an attorney's fee of almost 1.4 million dollars. Finally, Dr. Pepper argues that the district court erred in assigning equal proportions of the award against Dr. Pepper and Coca-Cola when Dr. Pepper was the target com-

pany of the acquisition and could not be liable for the underlying Clayton Act violation. Royal Crown counters with an argument that the district court erroneously denied certain legitimate costs and fees. Because we find that Royal Crown's litigation was not a substantial factor or a catalyst in motivating the defendants to abandon their transactions, we address only that issue.[2]

Section 16 of the Clayton Act, codified in 15 U.S.C. § 26, provides that "in any action under this section in which the plaintiff substantially prevails, the court shall award the cost of the suit, including a reasonable attorney's fee, to such plaintiff." Thus, the preliminary inquiry is whether Royal Crown "substantially prevailed" within the meaning of the statute so that an attorney's fee award is appropriate.

Although this Circuit has not yet addressed the award of attorney's fees under section 16 of the Clayton Act for actions brought to challenge a proposed acquisition, we note that other courts apply the same test of "prevailing party" in this area as is used under section 1988 of the Civil Rights Attorneys' Fees Awards Act. *See, e.g., Southwest Marine Inc. v. Campbell Industries*, 732 F.2d 744, 746 (9th Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *F & M Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 476 F.Supp. 203, 205–06 (S.D.N.Y.1979); *Grumman Corp. v. LTV Corp.*, 533 F.Supp. 1385, 1387–88 (E.D.N.Y.1982). Before turning to this standard, we wish to make clear that Royal Crown bears the burden of establishing its entitlement to an award. *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

In order to be a "prevailing party" under section 1988 and, by analogy, under the Clayton Act, "a plaintiff must receive at least some relief on the merits of

2. Royal Crown cross appeals, arguing that the district court erred in reducing their claim by $285,000. Royal Crown maintains that the disallowed expenses were legitimate costs recover-

able under section 26. Since we find that Royal Crown is not entitled to attorney's fees, the district court's disallowance of certain expenses as costs is irrelevant.

the claim." *Hewitt*, 107 S.Ct. at 2675; *see also Texas State Teachers Association v. Garland Independent School District*, —— U.S. ——, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In this case, Royal Crown did not receive any relief on the merits of its claim. The district court ordered a TRO to preserve the *status quo* until a hearing on the merits could be conducted. Later, the TRO was "extended" to a preliminary injunction because of a scheduling problem. No hearing on the merits ever took place and no substantive issues were ever adjudicated. Under these circumstances, the TRO/preliminary injunction entered in favor of Royal Crown does not, by itself, entitle Royal Crown to attorney's fees. *See Taylor v. City of Fort Lauderdale*, 810 F.2d 1551, 1558 (11th Cir.1987).

▆ Nonetheless, even in the absence of judicial relief, a plaintiff may still be a prevailing party if the plaintiff can show that his or her lawsuit was a causal link prompting some remedial action. *Fields*, 721 F.2d at 321. Such a causal connection or link is established by evidence that the lawsuit was a substantial factor or a significant catalyst in motivating the defendants to end their unlawful behavior. *Posada v. Lamb County*, 716 F.2d 1066, 1072 (5th Cir.1983). *See also Taylor*, 810 F.2d 1551, 1560.

Thus, although Royal Crown did not receive any judicial relief on the merits of its claims, it may still be a "prevailing party" if it establishes that its litigation was a substantial factor in causing the abandonment of the acquisitions. In order to meet its burden of proof on this issue, Royal Crown must do more than allege that its lawsuit prompted the appellants' actions. "The threat of litigation or even litigation itself is insufficient to establish a causal relationship...." *Braafladt v. Board of Governors*, 778 F.2d 1442, 1444 (9th Cir. 1985). Rather, Royal Crown must put forth some evidence establishing that its litigation actually played a substantial role in the appellants' decision to abandon the acquisitions. Under this burden of proof, the fact that the FTC also challenged the appellants' transactions is not fatal to Roy-

al Crown's position because Royal Crown need not establish that its litigation was the sole cause of the appellants' ultimate actions. Instead, Royal Crown must only prove that its litigation was itself *a* substantial cause in bringing about the appellants' decisions to abort the challenged transactions. *Posada*, 716 F.2d at 1072.

Although it bore the burden of proof and persuasion of an entitlement to attorney's fees, Royal Crown did not request the district court to hold an evidentiary hearing with respect to the attorney's fees issue. Indeed, the district court held oral argument on the causation issue only at the request of some of the appellants. Royal Crown did not attempt to depose, cross-examine or impeach any officers, directors or attorneys of the appellants on the issue of causation; it did not offer any documents or other material on the causation issue; and it did not respond to the appellants' affidavits. Instead, Royal Crown relies solely on the chronology of events and the appellants' alleged "vigorous opposition" to the motion for a TRO, to meet its "causality burden." While such reliance may be both sufficient and justified in some cases, in a case such as this one in which the plaintiff never received relief on the merits and in which other events completely obscure any inference to be drawn from the chronology of events, we believe something more is needed.

We note that in *Fields*, 721 F.2d at 320, 321, the district court held an extensive evidentiary hearing that resulted in a record that included expert testimony, charts, transcripts and correspondence. We also note that in *Iranian Students Association v. Sawyer*, 639 F.2d 1160 (5th Cir. Unit A, 1981), the Fifth Circuit found that the district court's refusal to hold an evidentiary hearing, despite the appellants' formal request, was clearly erroneous. "[T]he record must reflect ample evidence of a link between the litigation and the appel[lants'] action before the district court can award attorney's fees." *Id.* at 1163. Ample evidence potentially existed in this case on the issue of causation. For instance, Royal Crown could have questioned the directors of the appellant companies as

to whether the agreement between the appellants and the FTC not to close before midnight June 24th, 1986, was conditional on the FTC's vote such that a vote not to oppose the mergers would have allowed the appellants to close their respective transactions immediately. In addition, Royal Crown could have deposed members of the FTC and the FTC's attorneys to discover what impact, if any, the Royal Crown litigation had on the FTC's own actions and litigation. Finally, Royal Crown could have cross-examined and impeached the directors of the appellant corporations who submitted affidavits stating that the sole reason for the failure of the acquisitions was the FTC's opposition to them.

Because Royal Crown did not follow the prescribed course of action laid out by the above-mentioned cases in that it failed to request an evidentiary hearing, we presume that Royal Crown could not uncover any helpful facts to support its position. In the absence of Royal Crown submitting any evidence on the "causation" or "catalyst" issue, we must look to the totality of the circumstances to determine whether there is a causal connection between the Royal Crown litigation and the result achieved. In particular, we focus on the nature of the relief, the chronology of events and the role of the litigation of the movant seeking attorneys' fees. *Braafladt*, 778 F.2d at 1444; *Fields*, 721 F.2d at 321.

### A. THE RELIEF

Looking first at the nature of the relief, we must determine whether Royal Crown's ends were accomplished and whether the appellants' remedial action was required by law. *Posada*, 716 F.2d at 1071–72. There is no dispute that the resolution of this action provided Royal Crown with the relief that it sought when it originally filed suit. Through litigation, Royal Crown was hoping permanently to enjoin the appellants from consummating the acquisitions. The defendants' abandonment of the transactions was exactly what Royal Crown desired.

Furthermore, the FTC's vote to oppose the mergers supports an inference that Royal Crown had a "deserving case" on the merits. *Cf. Grumman*, 533 F.Supp. at 1389 (plaintiffs entitled to attorney's fees where it brought "deserving" antitrust case). Additionally, in its original complaint and application for a TRO, Royal Crown submitted extensive memorandum, affidavits and exhibits that support a finding that the appellants' proposed acquisitions would have had anticompetitive effects on the soft drink industry in violation of the antitrust laws. (*See* R1–3–Ex.; R1–1–Exs). While the evidence is certainly inconclusive, we believe that as long as it otherwise establishes that it substantially prevailed, Royal Crown has shown that its lawsuit furthered " 'the important national policies the antitrust laws reflect.' " *Grumman*, 533 F.Supp. at 1389 (quoting 1976 U.S.Code Cong. & Admin.News 2572, 2589).

### B. THE CHRONOLOGY OF EVENTS

We next turn to the chronology of events. While the chronology of events is important, it is not definitive because the question of causation is intensely factual. *Posada*, 716 F.2d at 1072; *Iranian Students Association*, 639 F.2d at 1163. If we look only at the timing of events as they relate to Royal Crown's litigation and the actions of the appellants, we might infer that the litigation caused the transactions to fail. After all, Royal Crown filed a complaint and obtained a TRO, extended the TRO, conducted discovery and was preparing for trial when the appellants suddenly abandoned the acquisitions. This depiction, however, is too simplistic and we decline to adopt such a *post hoc ergo propter hoc* analysis. "While the temporal relation between [a lawsuit and the relief sought] may be taken into account in determining ... a causal nexus, timing, in itself ... does not establish causation as a matter of law." *Public Law Education Institute v. Department of Justice*, 744 F.2d 181, 184 n. 5 (D.C.Cir.1984). Rather, a court must include all of the surrounding circumstances in its causation determination. *Braafladt*, 778 F.2d at 1444. Be-

cause of the FTC's involvement in the appellants' ultimate decision to abort their respective transactions, we cannot draw the usual inference of "cause and effect" from the chronology of events alone. Rather, we must evaluate the chronology of events in the context of the role that the Royal Crown litigation played in the abandonment of the acquisition. It is this evaluation that leads us to conclude that the district court erred in awarding attorney's fees to Royal Crown.

## C. THE ROLE OF THE LITIGATION

■ The district court made several factual "findings" to support its conclusion that Royal Crown's litigation was a substantial cause of the termination of Coca-Cola's and PepsiCo's acquisitions. Specifically, the district court found that the injunctive relief was "the first judicial relief and indeed the controlling relief throughout the legal challenge to the proposed transactions," and that this injunctive relief, along with "Royal Crown's vigorous prosecution and discovery efforts, constituted a substantial factor and a catalyst in motivating the defendants to terminate their acquisitions." This latter finding is without any record evidence to support it. The district court further found that "the Coca-Cola-Dr. Pepper transaction could not have been completed until [the court] ruled on its merits regardless of any decision made by the District of Columbia court as a result of the July preliminary injunction." (District court op. dated Jan. 16, 1987 at 6–7).

We hold that the totality of the circumstances surrounding the proposed acquisitions does not support the district court's findings regarding the role of the Royal Crown litigation in the failure of the acquisitions. In turn, the district court's inaccurate findings cannot support the conclusion that Royal Crown's lawsuit was a substantial factor in the abandonment of the transactions. The district court's holding, therefore, is clearly erroneous.

1. The Litigation was not the Controlling Relief.

First, the district court erred in finding that the Royal Crown litigation constituted the "controlling relief" against the consummation of the acquisitions. While it is true that the TRO in Georgia was the first judicial relief, it cannot be said to have been the controlling relief. The TRO, granted on June 20, came into effect after the FTC waiting period had been voluntarily extended until June 24. Once the FTC voted, on June 20, to block the mergers, it was clear that the extended waiting period would remain in effect and that the parties would not be able to close prematurely. Thus, the TRO did not forbid the parties from doing anything that they could have otherwise done.

One day before the termination of the stipulated waiting period, PepsiCo abandoned its proposal. Furthermore, on the day that the extended waiting period was to expire, Coca-Cola and the FTC entered into an agreement, approved by the D.C. district court, whereby Coca-Cola agreed not to proceed with its acquisition until a hearing was held on the merits in the D.C. court.[3] Finally, on July 31, after a three day hearing, the FTC obtained a preliminary injunction.

From the foregoing chronology of events it is evident that even without any TRO or injunction from the Georgia district court, neither PepsiCo or Coca-Cola could have gone forward with their respective acquisitions from the filing of Royal Crown's complaint on June 19 to its dismissal as to Pepsico and Seven-Up on June 26 and as to Coca-Cola and Dr. Pepper on August 25. The FTC first prevented the parties from going forward based on an extended statu-

---

**3.** One might question whether Coca-Cola would ever have stipulated to such an agreement if it were not for the TRO in Georgia. While such a hypothetical is impossible to answer, we do note that the FTC has a reduced burden to meet in order to acquire a TRO and that it is by no means novel for a party to enter into an agreement with the FTC not to close before a hearing is conducted. *See, e.g., FTC v. Owens-Illinois Inc.,* 681 F.Supp. 27 n. 1 (D.D.C.1988). Thus, without more, it would be speculation to say that the Georgia Court's TRO precipitated this action on the part of Coca-Cola.

tory bar and this bar remained in effect until the termination of the PepsiCo acquisition. The FTC next secured a stipulation and then a preliminary injunction both of which prevented the Coca–Cola acquisition from going forward. The Georgia TRO was not the controlling relief that prevented the consummation of the acquisitions.

### 2. A Ruling on the Merits Became Immaterial.

In finding that the Royal Crown litigation played a role in the failed transactions, the district court also relied on the fact that Coca–Cola and Dr. Pepper could not have consummated their transaction until the court had ruled on the merits of Royal Crown's claims. (D.Ct. op. dated Jan. 16, 1987 at 7). While this statement is true, the district court failed to put this observation in context. First, this observation has no application to the PepsiCo/Seven–Up transaction because these parties had abandoned their acquisition before the TRO was extended and before a trial date was set. Second, once the July injunction was entered in favor of the FTC, the Coca–Cola/Dr. Pepper transaction was effectively terminated.

The purposes of the Hart–Scott–Rodino Act's notification procedures and subsequent waiting period are twofold. First, the information submitted pursuant to the statute is intended to provide the FTC with sufficient data for a preliminary determination of whether the proposed merger may violate the antitrust laws. Second, the procedure is intended to allow the FTC enough time to analyze the reported data and seek a preliminary injunction without the difficulties attendant upon "unscrambling" a consummated transaction. Once the FTC votes to oppose a merger, it will file an administrative complaint. While the complaint is being prepared, the FTC often seeks a judicial TRO or preliminary injunction to enjoin the transaction pending an administrative resolution on the merits. This injunctive relief, authorized by 15 U.S.C. § 53(b), serves to avert post acquisition alterations which may make divestiture impractical or less effective and serves to undercut the economic incentives a firm might have to undertake the acquisition despite the odds that divestiture will eventually be ordered. Injunctions also create a significant impediment to the ultimate consummation of the merger. In order to obtain an injunction, the FTC need only show a likelihood of success on the merits and that the public equities justify such relief. In a practical sense, the granting of this injunction tolls the death knell for the challenged transaction because the parties to the merger usually cannot sustain its financial arrangements and terms for the period of years necessary for an administrative resolution. *See ABA Antitrust Section, Monograph 5, the FTC as an Antitrust Enforcement Agency: Its Structure, Powers & Procedures* 36, 73–74 & n. 273, Volume II (1981).

Because an FTC injunction indefinitely stalls an acquisition, once the FTC obtained such an injunction in this case, the existence of any other lawsuit challenging the propriety of the Coca–Cola/Dr. Pepper acquisition became a redundancy. In context, the fact that Coca–Cola and Dr. Pepper could not close before resolution on the merits of the Royal Crown litigation is irrelevant to the question of causation. A plaintiff may not collect attorney's fees for demanding of the defendant that which the defendant would have done in any case. *Doe v. Busbee*, 684 F.2d 1375, 1380 (11th Cir.1982) (in civil rights case, plaintiffs may not recover attorney's fees where suit merely demands a state officer to do what officer would have done in any case).

### 3. Royal Crown's Prosecution was Inconsequential.

The district court also considered the "vigorous prosecution" of Royal Crown to be factually important in determining causation. Royal Crown did put a considerable amount of resources into its challenge to the PepsiCo and Coca–Cola acquisitions. From January to April 1, 1986, Royal Crown evaluated the competitive effects of the acquisitions. In April, Royal Crown prepared and submitted an *amicus curiae* brief to refute the government's *amicus* position in *Cargill, Inc.*, 107 S.Ct. 484.

Royal Crown believed the brief necessary to protect its standing to challenge its competitors' acquisitions. This preparation preceded the complaint and application for a TRO in this case and the direct impact of this work on the appellants is questionable.

By May, 1986, Royal Crown began to identify witnesses and documentary evidence by interviewing various bottlers across the country. In June, Royal Crown filed a complaint and an application for a TRO. It then launched full-scale discovery "dispatching teams of lawyers to a number of locations to review the [appellants'] documents and simultaneously scheduled and commenced depositions of [appellants'] key officials and experts." [4] (D.Ct. Order at 3). This discovery effort resumed against Coca-Cola and Dr. Pepper after the district court's temporary stay of discovery expired.

While Royal Crown did expend a substantial amount of time, money and expertise, we find that its prosecution was not as "vigorous" or resolute as it might otherwise appear. Much of Royal Crown's time and money was spent in endeavors that preceded its application for a TRO. The mere "threat of litigation" does not entitle a party to attorney's fees. *Braafladt*, 778 F.2d at 1444. By the time Royal Crown filed its complaint, proceedings with the FTC had been continuing for some four or five months with all of the involved parties submitting thousands of documents. In fact, much of Royal Crown's document requests were for documents already produced to the FTC. (R4–81–83).

This is not a case in which the plaintiff acted "swiftly and decisively" to enjoin the acquisitions in question. *Cf. Grumman*, 533 F.Supp. at 1390 (plaintiff's swift action prevented takeover). Rather, Royal Crown elected to postpone litigation and "to maintain trial readiness" for some four or five months. Royal Crown admits that it did not immediately file its complaint because it feared that the FTC would not vote to block the mergers if the FTC believed that Royal Crown had already initiated such a challenge. On the other hand, Royal Crown states that it eventually had to file the motion for a TRO because it could not know how the FTC would vote and, therefore, it had to assume that the FTC would not oppose the mergers.

Timing the filing of a private antitrust suit does involve complex considerations. "Mergers first challenged in private suits have but rarely been attacked in independent [FTC] actions.... Conversely, few Government Section 7 proceedings have been followed by private ... actions." *ABA Antitrust Section, Monograph No. 1, Mergers and the Private Antitrust Suit: The Private Enforcement of Section VII of the Clayton Act Policy and Law*, 19–20 (1977). In addition, "where the Government has sued or not sued to halt a given merger, the appropriate party [may seek] advantage from this fact," and courts may be inclined to give deference to the FTC's assessment of the propriety of a merger. *Id.* at 28. A court, however, is not required to give deference to an FTC assessment, and the FTC does sometimes bring its own action against acquisitions regardless of the existence of a private action. *Compare e.g., Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974) with FTC Dkt. No. 9005, *Cargill, Inc., Trade Regulation Reporter*, transfer binder, Federal Trade Commission Complaints and Orders, 1976–1979, ¶ 20, 745 (January 21, 1975); *see also Grumman*, 533 F.Supp. at 1390 n. 10.

We appreciate that in knowing the workings of the FTC, Royal Crown felt obliged to make some tactical decisions. Royal Crown reasonably decided to maximize the chance that the FTC would take some action by postponing private litigation and, at the same time, filing its own complaint at the last minute to serve as insurance that the transactions would be challenged by someone in the event that the FTC failed to act. Justifiable strategy, however, does not justify attorney's fees. Under the statute, only proof that an individual has substantially prevailed will entitle that individual to an attorney's fee award. Royal

---

**4.** None of this discovery focused on Philip Morris and Seven-Up.

Crown urged the FTC to act; it should not now be surprised that that action proved decisive.

Under Royal Crown's strategy, we recognize that the TRO was a necessary precaution. Had the FTC voted not to block the PepsiCo and Coca–Cola transactions and had the FTC agreed that under such circumstances it was unnecessary to hold the parties to their June 24 closing date, the TRO *could have* played a crucial role because it would have prevented the parties from completing the transactions. The FTC, however, did oppose the transactions and did follow-up this opposition with a request for injunctive relief. The legal inquiry we make is based on whether the Royal Crown litigation was, *in fact*, a substantial factor causing the appellants' actions, not whether the litigation was prudent or would have been a substantial factor under a different set of circumstances.

Royal Crown urges us to consider the strength of the opposition to its motion for a TRO. *See F & M Schaefer Corp.*, 476 F.Supp. at 207. Royal Crown points to the very prominent attorneys who were dispatched from New York, Washington and Atlanta to argue against the TRO. How could it be, Royal Crown asks, that all these powerful attorneys would fly down to Columbus, Georgia to oppose a TRO that they considered inconsequential?

The answer, of course, is that at the time of the TRO hearing, the appellants had no way of knowing whether the TRO would be inconsequential or not. On the one hand, if the FTC voted not to block the mergers, the TRO would have been the only barrier preventing the appellants from closing. On the other hand, if the FTC voted to block the mergers, the TRO would add nothing to the "closing" equation. The appellants decided to fight the TRO in the hopes that the FTC would decide not to oppose the transactions. (R7–Tr. 63). Once again, we must decide the question of causation based on what actually occurred and not on what might have occurred.

Royal Crown chose to wait in the wings in the hopes that the FTC would take some definitive action. While such a strategy is sound in obtaining the ultimate results, it is not without consequences. The legal basis of Royal Crown's claim is that it was a catalyst in getting the appellants to terminate their acquisitions. A lawsuit filed to safeguard one's position does not become a catalyst simply because the lawsuit serves as protection in the event that the FTC fails to act. If Royal Crown wished to play understudy to the FTC instead of taking the lead role, then it ran the risk that, despite its time and preparation, it would never have the opportunity to perform. Without a performance, Royal Crown cannot now expect a curtain call. Royal Crown filed a precautionary lawsuit and started the litigation wheels moving after much of the desired information had already been produced to the FTC. Such action is neither swift nor decisive and it is not enough to confer upon Royal Crown the status of "prevailing party."

## D. THE TOTALITY OF THE CIRCUMSTANCES

Royal Crown vigorously argues that the existence of the FTC action does not prevent its own action from being a cause of the acquisitions' failure. Royal Crown points to two cases, one from the district court of Alabama and one from this Circuit to support its contention that private plaintiffs can and should recover attorney's fees despite government action. *See United States v. Marengo County Commission*, 667 F.Supp. 786 (S.D.Ala.1987) and *United States v. Terminal Transport Co.*, 653 F.2d 1016 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982). Royal Crown's reliance on these cases is misplaced. In both *Marengo* and *Terminal* the private plaintiffs filed suit first, with the government subsequently filing suit in the same court. In both cases the lawsuits were consolidated and the private plaintiffs and the government thereafter worked together in challenging the defendants. Finally, in both cases the court noted that the private plaintiffs attempted to avoid duplicative efforts so that the government's participation

actually saved the defendants a great deal of money because fees could not be assessed for the government's legal work.

The facts of the present case are totally inapposite. Royal Crown and the FTC worked separately and filed lawsuits in separate courts. The two parties made no attempt to collaborate and indeed, the parties considered some of the issues involved in the two cases to be wholly separate. (R2–63–Ex. D at 15; R5 at 14–16). As a result, the two actions must be evaluated separately. Under the circumstances of this case, Royal Crown may not ride on the coattails of the FTC but must show that it also contributed, substantially, to the failure of the challenged acquisitions.

In an attempt to demonstrate its contribution, Royal Crown argues that it is virtually impossible that its litigation had zero effect on the appellants. "Some award is due so long as the plaintiff's actions made an important contribution to the improvement achieved." *Posada,* 716 F.2d at 1072. The district court agreed with Royal Crown noting:

> Undoubtedly the parallel FTC proceeding in the District of Columbia also played a role in the abandonment, but the Court regards the contention of the Defendants that the pendency of this private antitrust action in this court was of no concern to the Defendants and was not a motivating factor in their decision to abandon the merger [sic] to be unrealistic and incredible. If Dionysus had suspended two swords over the head of Damocles is it likely that Damocles would have been concerned about one but not the other?

(D.Ct. op. dated Jan. 16, 1987 at 6 n. 1).

■ The district court's analogy obscures the inquiry that courts are to make under section 16 of the Clayton Act. That

inquiry requires us to undertake a factual analysis of whether the Royal Crown lawsuit significantly contributed to the abandonment of the acquisitions. The mere existence of a lawsuit, whether alone or proceeding at the same time as another lawsuit, is not enough. In cases where the defendant's actions unilaterally moot the pending lawsuit, we will deny attorney's fees if the defendant's conduct was " 'a wholly gratuitous response' " to the plaintiff's litigation. *Savidge v. Fincannon,* 836 F.2d 898, 905 (5th Cir.1988) (citations omitted) (evidentiary hearing required to determine whether appellant's litigation, a third party's litigation, or both, caused appellee's actions); *Braafladt,* 778 F.2d at 1444 (district court did not err in finding that a third party's litigation, and not the appellant's litigation, caused appellee's actions); *Iranian Students,* 639 F.2d at 1163 n. 4 (noting cases where a plaintiff's lawsuit was held not to contribute to the ultimate relief obtained).[5]

Royal Crown points only to the chronology of events to demonstrate a causal connection between its litigation and the ultimate result. It relies on speculation and argument to prove its case. In no part of the chronology of events do we glean a link between the Georgia litigation and the ultimate actions of the appellants. While we do not doubt that the appellants would have worried about the Royal Crown litigation if that litigation had ever become a controlling prohibition against closing, such was never the case. In light of the chronology of events viewed in the context of the surrounding circumstances, we are left with a "definite and firm conviction" that the district court made a mistake in finding that the Royal Crown litigation played a significant role in the abandonment of the acquisitions. *Anderson v. Bessemer City,*

5. *Martin v. Heckler,* 773 F.2d 1145, 1149 (11th Cir.1985) (en banc) is distinguishable from the instant case. In *Martin,* this court held that a civil rights plaintiff was a prevailing party despite the fact that the defendants voluntarily agreed to halt the challenged conduct. Although the defendants' decision occurred after the plaintiffs brought suit but before judgment, unlike this case, the plaintiffs provided the only

challenge to the defendants' actions. In *Martin* "[w]e searched the record in vain to find *anything* that would show the plaintiffs' action was not necessary to bring about a change in policy." *Id.* (emphasis added). In this case, however, there is ample evidence to conclude Royal Crown's suit was not necessary to stop the proposed merger.

470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

### III. CONCLUSION

Our opinion today is not meant to discourage citizens from acting as "private attorney generals" in the enforcement of the antitrust laws. We appreciate that the purpose behind section 16 of the Clayton Act is to encourage private citizens to bring suit, to insure that the cost of doing so will not be deducted from any eventual award and to impose a further penalty on the losing party. *Tic–X–Press, Inc. v. Omni Promotions Co.*, 815 F.2d, 1407, 1423–24 (11th Cir.1987). At the same time, however, a plaintiff must do more than to bring a carefully timed lawsuit as a potential back-up to government action.

In an application for attorney's fees in a case where the defendants' actions moot the controversy and both a governmental agency and a private party sought relief, the inquiry into whether the private party's lawsuit was a cause or catalyst for the defendants' actions is intensely factual and must turn on more than the simple recitation of the chronology of events. Instead of submitting evidence on the critical question of causation, Royal Crown relied on the Georgia district court record alone to establish that it was a "catalyst" and therefore entitled to attorney's fees. In the cases we have cited that are factually similar to this one and where fees were allowed, the plaintiff provided a factual basis upon which the district court could render an opinion. Because of the lack of proof in a case that does not lend itself to chronological inferences, the judgment of the district court is

REVERSED.